*428
Curia, per

Withers, J.
We are to treat the defendant, in each of these cases, as a bailee for compensation of the several slaves, the value of whom these actions were brought to recover.
The two last named plaintiffs were nonsuited: and Kelly was treated in a manner equivalent thereto, for so far as the only question presented by the other two cases was involved in his, it was withdrawn from the jury: which was tantamount to a nonsuit quoad hoc.
A slave of each plaintiff suffered death by law, for an act of violence, committed on white men, while the said slaves were at the workhouse of this city, and it is thus the plaintiffs have encountered damage. The precise cause to which, respectively, they would trace it, should, if possible, be accurately conceived.
Kelly’s case (as derived from his brief) is this: under sentence of a competent Court, the defendant had the custody of his slave, Nicholas, condemned as a malefactor, and suffering under judgment of imprisonment for a long term, prescribing solitary confinement during each alternate month: on the 13th July, 1849, he was not in solitary confinement, (nor does it appear that his sentence required him so to be at that time,) but was within the prison walls where negroes, at the workhouse on sale, were allowed to be. On the day stated, he resisted Gilchrist’s attempt to remove his negro girl from the workhouse, and beat Gilchrist’s man slave, Scotland. The Mayor of Charleston, being advised of this transaction, repaired to the workhouse, attended by sundry persons of the city guard, to quell the insubordination.— They were unarmed. The slaves of Holmes and Toomer were in the workhouse for safe keeping, and in conjunction with Nicholas, forcibly resisted, struck, and severely injured the master of the establishment, and others assisting him, whilst engaged in the object of restoring Nicholas to subordination : they escaped, were soon recaptured, were tried for the offence aforesaid, and were hanged. Holmes’s negro had been allowed to be a sort of turnkey, for locking up some of the cells : but the briefs shew no evidence that he used this trust (very improperly as we *429 think committed to him) to forward the purpose of riot and rebellion, in which the three negroes in question engaged, and whereby they forfeited their lives. In each of the cases, it is insisted that Nicholas was known to be ungovernable, in a peculiar degree, turbulent and dangerous : being infected (or at least professing to be) by certain ideas of personal rights, inconsistent with his subjection as a slave.
In this state of facts, as the plaintiffs insist, is included misconduct, by omission and commission, in the course of performing the contract of bailment, which was the cause of a felonious outbreak by their slaves, which outbreak became, in turn, the subject of prosecution as for a capital felony, which resulted in conviction, followed by the extreme punishment of the law : and such is the foundation of their claim to reimbursement.
In consideration of the nonsuit ordered in these causes, it is fair to assume that a jury might find, if allowed to investigate the subject, some degree and species of connection between the fatal event already mentioned, and the conduct of defendant: discoverable by starting from the final developement of events, and running up to antecedents. We cannot assume, however, that the jury would find but a single step between the extremes ; the gallows on the one hand, and the conduct of the defendant on the other; or that the chain connecting them, exposed but a single link. They might, perhaps, find their discoveries somewhat exemplified by the case of a line of telegraphic wires, capable of being united so as to form the entire circle, but when formed, requiring and exhibiting the independent agencies of sundry manipulations.
The cases must rest upon the question, whether the damages, thus suffered by the plaintiffs, be such as the law will recompense.
The professors of every system of law, whether it relates to morals or physics, religion or jurisprudence, are prone to formula which may seem to serve the united ends of enunciating great and broad truths: of lodging themselves safely in the understanding and memory, and becoming the standards for the adjustment, *430 in practice, of the greatest number of special cases. The cultivators of the common law, (and it may be said also of equity,) have not been less busy in this difficult enterprize, than the masters of other branches of knowledge. So, likewise, it is a fascinating employment of the human intellect, to trace the chain of cause and consequence, and to retrace, as Courts are often called on to do, from effect to cause. In this undertaking, the charm is rather heightened by the very mystery that so often surrounds it: it may be, because the error, if any, insinuated by sentiment and imagination, into that vantity which belongs to our imperfections, being our favorite offspring, is quite safe from condemnation before á tribunal of absolute truth.
Thus, however, free from any aim to deceive ourselves or others, speculation may pass for wisdom, acuteness for logic. Such cases as those now before us are calculated to invite into that boundless domain. It is dangerous for those whose operations affect individual rights, in every particular that renders life valuable, to tread, with too bold a step, into that region where the action of causes, physical and moral combined, creates a medium not well suited to our vision. While, therefore, the common law holds out the encouraging promise that it endures no injury from which another has suffered damage, without some remedy offered, such reflections as have been suggested may justify a qualification, may impress a caution, growing out of the very poverty of our powers of mind, and inculcated by the wise forecast of Judges and text writers, such as the following: “that the damage must always be the natural and proximate consequence of the act complained of.” (2 Green. Ev. §256.) That even that qualification it is easier to lay down than to apply, for (as observed by Mr. Sedgewick, in his treatise on damages,) “when we come to analyze causes and effects, and undertake to decide what is the natural result of a particular act, and what is to be regarded as unnatural, what is proximate and what remote, we shall find ourselves involved in serious difficulty. Many things are perfectly natural, and yet very remote consequences of a particular act: many other results are proximate, and yet so little *431 to be expected that they can scarcely be pronounced natural. Nor does the requirement that the damage be both natural and proximate, relieve us of the difficulty: in such cases we have no money standard to resort to, nor any agreement to guide us. The safest rule, in this class of cases, is to adhere as closely as possible to the principle that the direct and immediate, or the natural and proximate consequences of the act, are alone to be taken into consideration. Language confesses itself incompetent to depict the nicer shades of right and obligation, and all the rules will be found valueless, unless applied and expounded by tribunals as sagacious as they are learned.”
It may not be safe to say that the proximity of cause and effect shall be so close as to involve but one link only in the connection ; so immediate as to exhibit but one step in the line of descent. But a single remove from the generating cause increases the darkness that must attend our footsteps, and conducts us farther into the mazes of a labyrinth. It is our progress in this direction which is forbidden by the common more anxiously than by the civil law. Every step will introduce, as if by a geometrical ratio of increase, forces seen and unseen, physical, moral, collateral, independent — and, it may be, paramount. As in the genealogy of a man, so in tracing a consequence to its paternity, a very few removes upwards must reveal a multitude of participants in the parentage. Yery soon the circle of influences that produce and shape a particular event, will expand utterly beyond the reach of any human vision ! While all the scene must present to the eye of omniscience a natural sequence of events, harmonious in order, it will nevertheless defy the scrutiny of human investigation: causes unlike to each other, and seemingly in fortuitous combination, will produce a compound result far more amazing to the wisest of men than the drop of water to the uninitiated, which the chemist may present from two invisible gases, combined by electricity, without one of the properties of either. As well might a Judge and jury seek to designate in severalty the waters of tributaries in the lower Mississippi as to trace the thread of a primary cause in the web of *432 events into which it must be so soon woven. The like observations must apply to the idea that a result, which becomes the subject of an action, shall be the natural consequence of a cause, to be found in the act of the defendant. Nothing is unnatural that occurs: the most that can be said is this; looking through the medium of human experience and such knowledge as we think we possess, from observation and science, we must be able to see, through evidence, the line that connects the event with one prime cause, to the exclusion of another: it must be shewn to be, as it were, the lineal descendant of the defendant’s act: that the proof must be suited to develope this fact plainly enough to be clearly perceived by such understanding as we are obliged to use: that it must be sufficiently proximate, in the order of events, to cut off the introduction of other independent causes that may combine to produce it, or as a vis major, may assert a supremacy in the production.
The manifest propriety of such doctrine, and its solid foundation, will be the more readily acknowledged by him who has the most becoming and sincere sense of the insufficiency of human wisdom for all the trials to which it is subjected, especially upon the Bench and in the jury box; and who appreciates the danger of permitting a jury to roam with freedom where the highest judicial wisdom would reluctantly enter.
Whoever will consult the numerous cases that have given origin to discussion on this topic, must perceive that it is inherently difficult, and has not unfrequently tempted to casuistry and refinement. The great train of them brought under review by counsel and Court in Berkeley & Harrison, (1 Strob. 525,) will furnish the means of testing the observation. That case renders unnecessary, as it would, therefore, be inexcusable, a similar labor, on the present occasion. The task was there declined, as impracticable, of prescribing any general rules by which consequences, involving legal responsibility, shall be distinguished as too remote for adjustment by a Court. It was ruled on the circuit that Berkeley was liable for the natural and probable consequences of his act, to wit, selling liquor enough to a slave to *433 make him drunk, the consequence complained of being that the negro, thus made drunk by an act wrong in itself and unlawful, lay out all night and died. The doubt expressed in the opinion delivered by my brother, Wardlaw, was, whether the defendant had been properly entitled to the word “probable.” He observed, “for proximate and natural consequences, not controlled by the unforeseen agency of a moral being, capable of discretion and left free to choose, or by some unconnected cause of greater influence, a wrong-doer must generally answer, however small' was the probability of their occurrence.”
This observation is conformable to the rule stated and recommended by Mr. Greenleaf and Mr. Sedgewick, heretofore cited: a better does not occur to us, and it seems fairly deducible from the mass of cases that illustrate the subject, although we find in them a variety of expression: for example, “the damage must be the natural result of the thing done;” (per Patterson, J. in Kelly vs. Partington, 5 B. & Ad. 645,) “ every man must be taken to answer for the necessary consequence of his wrongful acts(per Tindal, in Ward vs. Weeks, 7 Bing. 211,) the special damage must be the “ legal and necessary consequence of the words spoken;” (per Ellenborough, in Vickars vs. Wilcocks, 8 East, 1.) Many other like instances may easily be consulted.
According to any rule that we can thus derive, how stand the cases before us ? So far as we can survey the line of cause and effect, the primary cause of the event that led to the execution of the negroes in question, is to be found in the turbulent passions and moral obliquity of Nicholas: for this the City Council could be in no wise responsible. He was lawfully and rightfully in their custody: they were not at liberty to exclude him from their prison. He is supposed to have become a moral pestilence by seducing into riot and crime the negroes of Holmes and Toomer. That cause acted by reason of contact between them all, being in the same prison, to which Nicholas was committed in due course of law, and the others by the voluntary act of their masters. No duty seems to have been violated in allowing the three negroes to be in the yard where communication became practica *434 ble. It was, therefore, no unlawful act of defendant that brought these negroes together. It was no act of defendant that made Nicholas a pestilence and the other slaves susceptible of the infection. The more proximate cause of the final catastrophe was the resistance made by Nicholas to the removal of Gilchrist’s negro, and the violence perpetrated by him for that end. Confessedly, that was no act of defendant. Was it the natural consequence of any ? Who can see the connection, as cause and effect, between the imprisonment of Nicholas within the walls, though out of a cell, and his warfare upon Gilchrist ? Here we have a new agent imported into the scene, to wit, the negro girl of a third person. How far her direct and intended agency may have worked to produce the first act of insubordination by Nicholas, who can tell ? As yet the negroes of Holmes and Toomer are inactive. Another incident occurs; the city authority attempted a forcible reduction of Nicholas to subjection. It was unsuccessful in this transaction. Nicholas was joined by the negroes of Holmes and Toomer: the three, in combination, committed audacious and felonious violence on the city authorities; they escaped, and were soon recaptured. Another event, in itself quite beyond the control of the defendant, and proceeding from an independent source, here supervenes. The negroes are tried by a legal tribunal, convicted and executed, being another distinct agency, that of the law of the land, acting upon the voluntary felony of the negroes, whose concoction of the design and its execution no human sagacity could anticipate or detect: and the action of the law, thus called forth, becomes the immediate cause of the loss to plaintiffs. The only further complaint against defendant is, that there was insufficient aid, vigor and expedition brought to the purpose of quelling the rebellion, and .that Holmes’s negro was allowed to be turnkey to some of the ¡cells. The latter circumstance bears no affinity or relation in the evidence, nor has any been suggested, to the causes of action. 'The former cannot be ranked as a cause of turbulence, which ended fatally to the negroes, but was at most merely an insufficient obstacle to arrest the current of events set in motion by a *435 cause wholly distinct from and independent of any thing done by defendant, to wit, the depraved moral qualities or the absurd notions of a moral agent belonging to Kelly, who found in other moral agents belonging to the other two plaintiffs willing confederates in voluntary crime. To say that in actions of this kind a defendant shall be held to prescience: that he shall be held to that awful account which makes him insurer against the mischief that may be designed and worked out by a creature endowed by moral and intellectual as well as physical attributes, a cause that he neither created nor shaped; that he shall be held to reason, a 'priori, and upon his peril, on the action of such agencies as others may argue upwards, when the event has enlightened them: that the custodiary of a mischievous slave shall be held responsible for the secret concoction or the sudden conception and execution of a felony, upon the ground that the developement shews the event might have been avoided, or the purpose, if known, counteracted, would be to invent tests of liability, in case, not hitherto discovered or recommended by our courts or by others. If the slaves in question had jumped into a well and drowned themselves, there would have been at least as natural a connection, and decidedly more .proximity between such consequence and all that defendant did, as we find in the cases made. By close confinement or fetters, or other device, other mischiefs, as well as the one that has occurred, could have been prevented. The mind can easily summon various like illustrations.
Upon principle and authority, we are led to adjudge that the motions in each of these cases be refused.
O’Neaul, Evans, Wardlaw, Frost and Whitner, JJ,, concurred.

Motions refused.